## CHICAGO AND ALTON RAILWAY COMPANY

### v.

## ABRAHAM BUCK.

1. RAILROAD FENCES—FASTENINGS TO GATES.—A railroad company is not required to fasten gates to railroad fences so that it is impossible for stock to open them under any and all circumstances. It has a right to use the fastenings commonly adopted in the country by persons reasonably prudent and careful, and regarded by them as safe, for the purpose.

2. NEGLIGENCE—DUTY OF INJURED PARTY.—The law imposes upon a party injured from another's breach of contract or tort, the active duty of making reasonable exertions to render the injury as light as possible. If, by his negligence or willfulness, he allows the damages to be unnecessarily enhanced, the increased loss, that which was avoidable by the performance of his duty, falls upon him.

3. SAME.—In all cases where one sees the gate of his neighbor open, the latch insecure, a board off the fence, or any other defect which can be at once remedied without any considerable cost or labor, and his own stock

is liable by reason thereof to escape from his premises and receive injury, it is his duty to protect himself against the threatened danger by closing the open gate, securing the defective fastening, nailing on the loose board, or otherwise securing himself against the threatened loss.

4. WEIGHT OF EVIDENCE.—The affirmative of the issue to show negligence of appellant's servants in managing the locomotives and train was upon appellee, but as the weight of the evidence was so clearly with appellant as to show that the jury have done manifest injustice, the judgment is reversed.

APPEAL from the Circuit Court of Logan county; the Hon. G. W. HERDMAN, Judge, presiding. Opinion filed February 5, 1884.

Messrs. BLINN & HOBLIT, for appellant; that where stock are killed on a railroad track, if the company has maintained proper fences, the rate of speed at which its trains are moving has nothing to do with the question of responsibility, cited C., B. & Q. R. R. Co. v. Lee, 68 Ill. 576; White v. N. & B. R. Ry. Co., 15 Hun, 333; Such v. C. & C. R. R. Co., 2 West. L. M. 486; C. & A. Ry. v. Robinson, 9 Bradwell, 91.

Messrs. BEACH & HODNETT, for appellee; that the gates and bars at farm crossings are part of the fence that railroad companies are bound to keep up under the statute, cited Great West. R. R. Co. v. Helm, 27 Ill. 199; I. C. R. R. Co. v. Arnold, 47 Ill. 173; C. & N. W. Ry. Co. v. Harris, 54 Ill. 528.

A railroad company is liable for killing stock if killing could be avoided by the exercise of ordinary care and diligence: Shuman v. I. & St. L. R. R. Co., 11 Bradwell, 472; R. R., I. & St. L. R. R. Co. v. Lewis, 58 Ill. 49; R. R., I. & St. L. R. R. Co. v. Irish, 72 Ill. 404; R. R., I. & St. L. R. R. Co. v. Rafferty, 73 Ill. 59.

Unless manifestly against the weight of the evidence, the verdict will not be disturbed: Crain v. Wright, 46 Ill. 107; Wolbrecht v. Baumgarten, 26 Ill. 291; Chittenden v. Evans, 48 Ill. 52; Calvert v. Carpenter, 96 Ill. 63.

HIGBEE, J.   This was a suit brought in the Logan Circuit Court by Abraham Buck against the appellant railroad com-

pany, to recover damages for the loss of several horses, alleged by him to have been killed by the carelessness of the servants of the company in operating its trains of cars on its road. The trial was before a jury, resulting in a verdict and judgment against appellant, from which an appeal is prosecuted to this court, and a reversal asked, mainly upon the ground that the verdict was against the evidence in the case.

Mr. Buck was the owner of a farm, through which the track of appellant's road lay. On one side of the road was a pasture separated from the right of way by a fence belonging to the railroad company, and near to his house was a gate, leading out of the pasture to a farm crossing, constructed for the use of the farm. About eight o'clock on Saturday night, October 21, 1882, appellee had, running in his pasture, twenty-two head of horses; between that time and six o'clock the next morning, the horses had escaped through the gate onto the railroad track, and four of them were so badly injured that they had to be killed.

The first ground upon which it is claimed that appellant is liable for the injury to the stock is, that the fastenings on the gate were not sufficient to prevent the horses from opening the same and going onto the track. There was no complaint of the sufficiency of the fences, and appellee himself testified that the same gate through which the horses passed, had stood at that farm crossing since 1866. The only defect complained of, was the manner of fastening the gate. This was done with an iron hook, attached to the gate at one end, and the other hooked into an iron staple driven into a large oak post. Appellee says, " there were two staples on the post with a latch on the gate to hook into them, one lower down than the other; when hooked in the upper one, it drew the gate nearly up against the post."

He says " it had a little over an inch play, perhaps an eighth of an inch over; and I think stock could get the gate open by rubbing against it and getting the hook out; I mean by rubbing and striking against the hook. A horse could lift it out by getting hold of it with his teeth." By other evidence it appears, that in order to fasten the hook into the staple it

was necessary to raise it up, and it could only be unfastened by lifting the gate up to get the hook out of the staple in the post. It seems that appellee and his family were in the constant habit of passing through this gate. He passed through it the evening before the accident, and his hired man, Mr. Former, went through, between seven and eight o'clock, and fastened the hook, and the gate was closed the next morning. It does not appear just how long these fastenings had been used, but evidently for several years before the horses were injured, with the slight change that this hook was set just above another that had been formerly used. And even after the horses were killed, the same fastenings seem to have been used for more than six months, without any change or complaint by appellee.

A short time before the horses were killed, the fence repairer of the road was engaged in repairing the fence, and called on Mr. Buck to point out any repairs needed on the line of this fence, which he did, and the repairs were made; but he did not speak of the gate or the fastening as needing any repairs. From all this evidence, we are satisfied that both the employes of the road, whose duty it was to keep the fences in repair, and Mr. Buck, regarded the fastenings to the gate sufficient, under ordinary circumstances, to turn stock. Had Mr. Buck regarded them as unsafe and his stock in danger, it is strange that no complaint was heard from him, and still more so, that he did not mention the fact to the fence repairer when called upon for that purpose.

It is not shown whether the gate was opened in the night by the horses or by some person who had passed through. In the whole sixteen years it had been there, it had never been opened by stock, so far as the evidence shows.

The company was not required to fasten the gate so that it was impossible for stock to open it under any and all circumstances. It had a right to use the fastenings commonly adopted in the country by persons reasonably prudent and careful, and regarded by them as safe, for the purpose. It is not likely that many gates could be found in city or country, fastened with latch or hook, that it would be impossible to

open by the nose or teeth of a horse if dexterously applied for that purpose. To hold that the company must provide against such contingencies, would be to adopt a standard of diligence that would make it an insurer of the sufficiency of its fences under all circumstances. This the law does not require.

But, admit that the fastening on the gate was so clearly dangerous as to charge the servants of appellant with notice of that fact, and made it their duty to repair it, that fact was necessarily known to appellee and his servants, who were in the constant use of the gate, and passed through it and used the fastening only the night before the horses were killed. Had he no duty to perform? Could he, knowing the dangerous condition of the gate, and that his twenty-two head of horses were liable at any moment to open it and go upon the track and be exposed to injury from passing trains, sit quietly by and rely upon the law to compensate him for any injury that might be done his stock? On the contrary, the law imposes upon a party injured from another's breach of contract or tort the active duty of making reasonable exertions to render the injury as light as possible. If, by his negligence or willfulness, he allows the damages to be unnecessarily enhanced, the increased loss, that which was avoidable by the performance of his duty, falls upon him. Sutherland on Damages, Vol. —, p. 148. In an action for damages resulting from the alleged injury to crops through default of the defendant in not building or repairing a fence, or his tortious opening of the same, where the party suffering from the injury is aware of the fact and the cause, and that by a little timely labor and expense the damages could be avoided, the law imposes the duty on him to stay the injury, when he is in a favorable situation to do it, and enforces the duty by confining his redress for the injury to compensation for the necessary and proper means of prevention. Id. p. 150; Andrews v. Jones, 36 Tex. 149; Campbell v. Miltenberger, 26 La. An. 72; Loker v. Damon, 17 Pick. 284; Fisher v. Gachel, 40 Mo. 475; Waters v. Brown, 44 Mo. 302.

If the gate did not appear to appellee as likely to endanger

the stock, as no doubt was the case, then the servants of appellant, who had far less opportunity to know, were not chargeable with notice or neglect in failing to repair; but if it was apparent to him that the fastening was so insecure as to endanger the horses, he had it in his power to have secured it until notice could be given, and in the absence of appellant's servants it was his duty to have done so. This he could have done without any considerable labor or expense. A nail over the latch, a rope tied around the bar of the gate and the post, and perhaps other means not more expensive, would have avoided the apparent danger and averted the injury he now sues for. It can not be that the law will compensate a person for damages foreseen by him and which can be prevented with trifling exertion or expense; and we think it may be laid down as a safe rule, that in all cases where one sees the gate of his neighbor open, the latch insecure, a board off of the fence, or any other defect which can be at once remedied without any considerable cost or labor, and his own stock is liable by reason thereof to escape from his premises and receive injury, it is his duty to protect himself against the threatened danger by closing the open gate, securing the defective fastening, nailing on the loose board, or otherwise securing himself against the anticipated loss.

It is next contended by appellee that assuming that his horses were on the railroad track without the fault of appellant, he is entitled to recover the value of his horses, killed because of the negligence of appellant's servants in managing the locomotive and train after the horses came onto the track.

The evidence on this subject is voluminous, and as the case must go before another jury we forbear discussing it in detail. No witness saw the accident, and appellee, to sustain the allegation of negligence, relies wholly on circumstantial evidence, consisting in the appearance of the tracks of the horses, the manner in which they were thrown from the track, and the marks on the ground at and near the place where the accident occurred. It is contended from these indications that the train that struck the horses was going north, and that these evidences tend to show that they were struck after they had

been chased a considerable distance, at a place where the view of the track was unobstructed, and that with ordinary care the employes of the road should have seen the horses in time to have saved them.

On the other hand, but three trains passed north after the time the horses were known to have been in the pasture in the evening, before they were found injured the next morning. The first was a freight train, No. 11, which passed the place of the accident not far from eleven o'clock, P. M. The next was the regular passenger which passed between twelve and one o'clock, and the remaining train was a special, carrying Gen. Sherman and party, which passed the place of the accident near five o'clock, A. M., running at a rate of speed of over fifty miles an hour. The engine driver of each of these trains, and most of the firemen and brakemen of each, were put upon the stand as witnesses, and each and all testified that they neither saw or struck any stock at or near the place named that night. It is in proof, however, that it was foggy and dark toward morning, and that it was impossible to see any considerable distance ahead by the head light. Three trains passed south during the night; the employes of two of them testify that no stock was struck or injured by their trains; the third was a freight that passed by the place of the accident not far from two-fifteen A. M. The engine driver and conductor of this train testified that their train ran into a drove of horses near the place of the accident and knocked one or more off from the track. It was so dark that they could not see very well how many horses were hit. By the evidence of the section boss there were no other horses injured on that night anywhere near that place. This accident the engineer reported on the same day as soon as he reached the end of his division, as he was required to do by the rules of the company, and the same was forwarded to and received by the proper officer of the road at Chicago.

This evidence leaves but little room to doubt that a part if not all of the horses were killed by this train and the engineer and conductor show themselves guilty of no negligence in the management of their train. It was so dark that,

although keeping a good lookout, they could not see the horses in time to avoid the accident.

It is hardly necessary to refer to the freight train spoken of by Abram Nicodemus, as it is clearly shown that he was mistaken.

The employes of the special train testify that they were keeping a close watch and saw no horses; but dark as it was, and running at the rate of speed they were, and which they had a perfect right to do, so far as appellee was concerned, it is not impossible that all four of the horses might have been killed by it just where they were found without imputing negligence to the servants of appellant.

The affirmative of the issue to show negligence was on appellee, while the great weight of the evidence was so clearly with appellant as to show that the jury have done manifest injustice, for which reason the judgment is reversed and the cause remanded.                    Reversed and remanded.